La Fontaine *v.* State

No. 39746 March 21, 1955 78 So. 2d 600

*R. D. Everitt,* Ruleville, for appellant.

*Joe T. Patterson,* Asst. Atty. Gen., Jackson, for appellee.

McGehee, C. J.

The appellant, August C. La Fontaine, was indicted on September 9, 1954, for the murder of Ralph DeLoach on the 28th day of March, 1954. An attorney was appointed to defend him a few weeks prior to the September 1954 term of the court at which he was tried, convicted, and sentenced to death for his crime of murder. Both the accused and his victim, DeLoach, were serving terms in the state penitentiary at the time DeLoach was stabbed to death with a homemade knife by the accused.

The place of the homicide was in the west wing of the sleeping quarters at Camp No. 6 in the Mississippi State Penitentiary. It occurred on Sunday afternoon between 1:30 and 2:00 o'clock. Both the accused and his victim had formerly resided in the east wing of the building where the sleeping quarters of one-half or 56 of the convicts in this building were located. On February 26, 1954, while these two men were still assigned to the east wing, they became engaged in a fight with each other, and on which occasion the accused had undertaken to get a shovel from a nearby coal bin, and for the apparent purpose of inflicting an injury to DeLoach, who was then one of the night bosses in the east wing of the sleeping quarters, and during which fight DeLoach

struck a blow on the head of the accused, and with the result that thereupon the accused was hospitalized.

The proof disclosed that the other 56 convicts slept in the west wing of the building. Shortly after the fight that occurred on February 26, 1954, as aforesaid, the accused at the suggestion of one of the other prisoners made the request of the sergeant that he be transferred from the east wing to the west wing where he would not be under the authority of DeLoach, since it appears that at that time there was a bad feeling existing between the two men on account of this previous difficulty.

About 12 or 14 days prior to the killing on March 28, 1954, DeLoach also obtained a transfer from the east wing to the west wing of the building, where he continued as "cage-boss" and resumed authority over the accused. The testimony of the person who consented to the transfer of DeLoach to the west wing where the accused was residing is to the effect that he had been advised by both of these men that they had settled their difficulties. Nevertheless, the record before us discloses that the accused La Fontaine was a dangerous man, and that DeLoach should not have been transferred to the west wing, even at his own request, and placed in authority over La Fontaine in view of the threats that each had made to kill the other, thus affording an opportunity for this smouldering animosity to be rekindled into a flame of deadly fury.

On the afternoon of the killing, DeLoach, doing night work as "cage-boss" and whose duty it was to see to it that each of the prisoners were in their respective beds at night and to preserve order, etc., was sleeping in his own bed, and presumably had been asleep since he retired about 7:30 o'clock that Sunday morning. The accused La Fontaine and the other prisoners in that wing of the sleeping quarters had slept during the previous night and were merely "lounging about" in the west wing of the building during that afternoon, when it appears that the accused La Fontaine and his co-indictee,

Fred Lamar Scott, had conspired to kill DeLoach. Upon retiring that morning, DeLoach had draped the bed on each side and at the foot with blankets or quilts extending from the upper bed down to the lower one in which he retired to sleep, so as to make it dark and enable him to sleep during that day, the other end of his bed being against the wall.

Immediately prior to the killing the accused La Fontaine was seen to walk slowly and stealthily toward De-Loach's bed, while watching such other prisoners as were then in their sleeping compartment; and Fred Lamar Scott was seen to go between this bed and another on the other side thereof from La Fontaine. A fellow prisoner testified that he had just previously observed that La Fontaine and Scott appeared to be somewhat nervous, and this prisoner asked Scott what was the trouble, when Scott replied, "Never mind, you will see." His testimony discloses that he suspected that trouble was brewing, but he did not report their suspicious conduct or try to prevent the impending tragedy, perhaps fearing that the same fate would come to him that DeLoach immediately suffered.

A number of witnesses testified that La Fontaine, upon arriving at DeLoach's bed, pulled aside the blanket or quilt which was draped from the upper bed and began to cut DeLoach several times with a knife; that De-Loach was sleeping in the bed, dressed only in a pair of shorts and an undershirt and with no weapon about his bed, when the cutting occurred; and La Fontaine was seen with the knife in his hand by several witnesses after DeLoach got out of the bed and tried to escape from his assailants. In trying to get away DeLoach passed near Scott who struck him a blow with some instrument.

The proof further shows that La Fontaine disclosed to a prisoner named "Mose" the presence of this knife in his hand and asked him if he "wanted part of it." Thereupon, La Fontaine went to the latrine where he re-

mained approximately one minute, and where the home-made knife, later introduced in evidence in the trial, was found.

The State introduced ten witnesses, all of whom, except the doctor who testified about the fatal wound and except one sergeant, were convicts. When the prosecution rested its case on the testimony of all of these witnesses, the defense likewise rested without introducing the accused, La Fontaine, and all of the witnesses were white men.

The proof shows conclusively, and it is wholly undisputed as aforesaid, that La Fontaine stabbed DeLoach to death, in a brutal, calculated, and savage manner. Then he remorselessly turned to another prisoner with the knife in his hand, and asked him if he wanted part of it, as heretofore mentioned.

The appellant in the instant case, La Fontaine, assigns as error on this appeal, and as alleged grounds for the reversal of the case: (1) the refusal of the trial court to allow the appellant's counsel to interview him and his witnesses out of the presence of the penitentiary guards when the court was requested to do so, the request being made before the witnesses had been placed under the rule; (2) the granting of the two instructions in favor of the State; (3) the refusal of four instructions requested by the appellant; and (4) the overruling of the appellant's motion for a new trial.

The assignment of error most strongly relied upon is the first assignment above set forth. Prior to the introduction of any testimony, the record discloses the following statements made by the attorney for the appellant who had been appointed in vacation a few weeks prior to the convening of the term of court, and by Mr. Sanders, the district attorney, and by the trial judge, presumably out of the hearing of the jury, to wit:

"MR. EVERITT:

"Let the record show that Defendant's counsel now requests permission of the Court to interview the De-

fendant and his witnesses out of the presence of armed guards at a time when they have not been placed under the rule.

"MR. SANDERS:

"Let the record show at the time and place at which this request is made, it is at the courthouse after the jury has been impaneled and the request is that the Defendant be taken from the presence of the guards in a substantially secure courtroom on the second floor of the courthouse into rooms which have open and unbarred windows;

"Let the record show further that the Defendant's counsel has been extended every opportunity to consult with their witnesses and with the Defendant separate and apart from any guard or anyone whatsoever at the Mississippi State Penitentiary at Parchman for a period of at least two months previous to this trial; and

"Let the record show counsel was appointed in vacation in order to assure ample time for consultation with all witnesses at the State Penitentiary and the Defendant, where they were securely imprisoned.

"COURT:

"Let the record show that this man on trial, August C. La Fontaine, has a prison record for convictions of crimes of violence and of escape from the State Penitentiary and further, at the March term of this court he was convicted of assault and battery with intent to kill and murder another prisoner, and the Court is of the opinion that he is dangerous and the request is overruled. Exception by Defendant.

"MR. SANDERS:

"The State further states that it is entirely willing for Defendant's counsel to consult with Defendant and his witnesses in the presence of a guard and the State's attorneys will not ask the guard present any questions whatsoever about the nature of the questioning and will not use such guard for the purpose of impeachment or otherwise in contradiction of any witness."

██ ██ While this accused and any witnesses that he may have had that were inmates of the penitentiary could have been safely guarded by the use of the sheriff or his deputies at the door of the witness room, and by stationing for the period of the proposed conference the penitentiary guards on the ground below the windows of the witnesses' room, which was located on the second floor of the courthouse, we are of the opinion that in view of the foregoing statements quoted from the record, there was no abuse by the trial judge of his discretion in refusing this conference with the appellant and his witnesses out of the presence of the penitentiary guards. If this conviction had been based on conflicting testimony as to the facts, then we might have a different question to deal with than is here presented, since it would be the better rule in such a case to permit an attorney for the accused to confer with him and his witnesses out of the presence of penitentiary guards who may have been in authority over these prisoners, on the reasonable presumption that then the accused and his convict witnesses would have been perfectly free and untrammeled to participate in the conference with the attorney without fear or apprehension as to any unfavorable reaction on the part of the penitentiary guards toward them in regard to anything that they may have disclosed in such a conference. But in the instant case where the defendant advanced no theory of justification for the homicide other than the bad feeling that existed between him and the deceased immediately following the fight which occurred approximately one month prior to the killing, and which differences the accused is shown by the undisputed testimony to have stated to one or more of the State's witnesses had been settled prior to the time that his victim was transferred from the east wing of the sleeping quarters to the west end thereof where the accused then resided, we do not think that in view of the foregoing uncontradicted statements of the district attorney and the trial judge there

was an abuse of the discretion of the trial court in the exercise of its judgment as to what means should be employed to safeguard this dangerous prisoner from making an escape.

In the case of Scott v. State, 56 So. 2d 839 (Miss.), the Court said: "Such matters (requested conferences with witnesses within reasonable limitations) are generally within the sound discretion of the trial court, in the absence of a showing of abuse of that discretion and of probable prejudice to defendant." Moreover, the attorney for appellant states in his brief: "It is true that I, as counsel for the defendant, was appointed by the court in vacation several weeks before the trial, and it is further true that I had ample time for consultations with all of the witnesses at the State Penitentiary. * * * I did consult with the defendant and numerous witnesses at various times without molestation at the penitentiary." But he further said in his brief that they would tell him one thing one time and an entirely different story at another time. We do not think, however, "free access to the prisoner" was denied within the meaning of Section 2505, Code of 1942, as amended by Chapter 351, Laws of 1950, as contended.

We find no error in either of the two instructions in favor of the prosecution. Nor do we find any error in the refusal of any of the four instructions requested by the accused, as complained of. The first of the refused instructions was to the effect if the jury believed "that any witness has willfully and corruptly sworn falsely to any material fact in the case you may wholly disregard the testimony of such witness." This instruction has been condemned in numerous cases recently decided by this Court, and is no longer available to a party, in either a civil or a criminal case.

The second refused instruction is to the effect that if there be two reasonable theories which may be drawn from the evidence, one of the guilt of the defendant and the other of his innocence, and the jury has a rea-

sonable doubt as to which is the correct theory, then it is the sworn duty of the jury to adopt the theory of innocence and acquit the defendant, even though the jury may believe from the evidence that the theory of guilt is more plausible and supported by more and better evidence. This instruction concludes by the words: "Yet, in such case, you must acquit the defendant." There was no evidence in the instant case from which two reasonable theories could have been drawn. Moreover, this instruction is proper only in cases of circumstantial evidence, and not in cases where the willful and deliberate killing of a human being is fully established by eye-witnesses.

■■ The third refused instruction was to the effect that the jury may take into consideration the previous difficulty between the accused and the deceased "in making up your verdict and fixing the penalty to be imposed upon the defendant." This was not only an instruction upon the weight of the evidence, but it is presumed that the jury would necessarily take into consideration all of the evidence in the case in fixing the penalty to be imposed upon the defendant.

■■ The fourth refused instruction sought to instruct the jury that it could return a verdict of guilty for the crime of manslaughter. It is well-established by many decisions of this Court that where a killing is, under the proof, either murder or justifiable homicide, the court should not give instructions upon manslaughter. Alexander's Jury Instructions, Section 2480, and Hannah v. State, 87 Miss. 375, 39 So. 855.

Nor do we think there was any error in the action of the trial court in overruling the motion of the defendant for a new trial.

The judgment and sentence appealed from must therefore be affirmed, and Thursday, April 28, 1955, is here-

by fixed as the date for the execution of the death sentence, in the manner now provided by law.

Affirmed.

All nine of the justices concur.